# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| DONALD KNAPP; EVELYN KNAPP; HITCHING POST WEDDINGS, LLC, | Case No.: 2:14-cv-00441-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| vs. | |
| CITY OF COEUR D'ALENE, | **(Docket No. 31)** |
| Defendant. | |

Now pending before the Court is Defendant's Motion to Dismiss First Amended

Complaint (Docket No. 31).  Having carefully considered the record, participated in oral

argument, and otherwise being fully advised, the Court enters the following Memorandum

Decision and Order:

## I.  INTRODUCTION AND SUMMARY OF DECISION

Donald and Evelyn Knapp (the "Knapps") are the owners of Hitching Post Weddings,

LLC, a business located in Coeur d'Alene, Idaho, which provides wedding services.  Such

services generally involve wedding ceremonies performed at their business location (the

"Hitching Post") and usually performed by one of the Knapps as the officiant.  The Knapps

contend that their rights have been violated because a local anti-discrimination ordinance places

them into a Hobson's choice of choosing between violating their religious beliefs by performing

same-sex wedding ceremonies, or violating City Ordinance § 9.56 (the "Ordinance") by refusing

to perform same-sex wedding ceremonies.  In this lawsuit against the City of Coeur d'Alene (the

**MEMORANDUM DECISION AND ORDER - 1**

"City"), the Knapps seek (1) compensatory damages for the seven days they say they were forced to close the Hitching Post due to the City's alleged threats to enforce the Ordinance against them; and (2) to enjoin any enforcement by the City of the Ordinance, as unconstitutional in violation of "the Free Speech Clause, the Free Exercise Clause, the Equal Protection Clause, the Due Process Clause, and Idaho's Free Exercise of Religion Protected Act."

The City seeks dismissal of the case, claiming that Hitching Post Weddings, LLC is a religious corporation and therefore specifically exempt from the Ordinance's authority. According to the City, because the Ordinance does not apply to either Hitching Post Weddings, LLC or the Knapps, each of them lacks standing to bring this lawsuit and their claims are not ripe for review.

Through this Memorandum Decision and Order, the Court grants, in part, and denies, in part, the City's Motion to Dismiss. The Knapps have standing to bring a claim for compensatory damages associated with the Hitching Post's closing on the single date of October 15, 2014; in this respect only, the Motion to Dismiss is denied. However, the Knapps do not have standing (1) to bring a claim for compensatory damages associated with the Hitching Post's closing on October 7, 8, 9, 10, 11, and 14, 2014, or (2) bring a pre-enforcement challenge to the Ordinance; in these respects, the Motion to Dismiss is granted.

That the Knapps have standing to bring a claim for compensatory damages associated with the Hitching Post's closing on October 15, 2014 does not mean that they prevail as a matter of law on such a claim; rather, they are simply permitted to move forward in asserting such a claim through this legal action. The actual merits and scope of this discrete claim are not addressed at this time.

**MEMORANDUM DECISION AND ORDER - 2**

## II.  RELEVANT BACKGROUND[1]

### A.    The Knapps and the Hitching Post

1.      Plaintiffs Donald and Evelyn Knapp are Christians and ordained ministers of the International Church of the Foursquare Gospel.  *See* Pls.' First Am. Compl., ¶¶ 51, 54, 77, 83 (Docket No. 29).  Mr. Knapp first officiated a wedding in 1969.  *See id*. at ¶ 79.

2.      Mr. Knapp learned about the Hitching Post in Coeur d'Alene, Idaho around 1975 from a member of his church, John Green; Mr. Green worked at the Hitching Post and eventually purchased it.  *See id*. at ¶ 86.

3.      Mr. Knapp began working at the Hitching Post in 1987, which included officiating weddings there one day a week.  *See id*. at ¶ 89.  Mr. Knapp continued to work at the Hitching Post in this capacity for one and a half years.  *See id*. at ¶ 90.

4.      In 1989, the Knapps purchased the Hitching Post from Mr. Green.  *See id*. at ¶ 94. For their newly-acquired business, the Knapps formed a new Washington state corporation, named D.L.K. Enterprises, Inc.  *See id*. at ¶¶ 95, 96.  D.L.K. Enterprises, Inc. D/B/A the Hitching Post was organized as a "profit corporation," under Washington law.  *See id*. at ¶¶ 97, 143, 156.  The Knapps also elected to file their federal and Idaho tax returns for "D.L.K. Enterprises, Inc. D/B/A the Hitching Post" as an S-Corporation.  *See id*. at ¶¶ 101, 143.

5.      The Knapps continued to operate the business as an S-Corporation until September 12, 2014, when they created a new business entity known as Hitching Post Weddings,

---

[1]  This section discusses not only the instant action's backdrop, but also other legal proceedings taking place over the same period of time.  These proceedings sometimes overlap, creating a somewhat disjointed factual landscape to this Memorandum Decision and Order.  To help reduce any confusion stemming from this overlapping patchwork of events, this section contains various topical headings, followed by numbered paragraphs, organized in chronological format (for each particular heading).

**MEMORANDUM DECISION AND ORDER - 3**

LLC (another Plaintiff in this action) by filing a certificate of organization with the Idaho

Secretary of State.  *See id.* at ¶¶ 144-145; *see also* Gridley Decl., ¶ 8 (Docket No. 31, Att. 2).

Hitching Post Weddings, LLC is a for-profit enterprise; the Knapps are its members, owners, and

operators.  *See* Pls.' First Am. Compl., ¶¶ 53, 56, 146, 156 (Docket No. 29).[2]

      6.     On October 6, 2014, the Knapps executed the "Operating Agreement of Hitching

Post Weddings, LLC." *See id.* at ¶ 161; *see also* Op. Agmt., attached as Ex. 2 to Pls.' First Am.

Compl. (Docket No. 29, Att. 2).  According to the Operating Agreement:

> The Hitching Post is a religious corporation owned solely by ordained ministers of
> the Christian religion who operate this entity as an extension of their sincerely held
> religious beliefs and in accordance with their vows taken as Christian ministers.  The
> purpose of the Hitching Post is to help people create, celebrate, and build lifetime,
> monogamous, one-man-one-woman marriages as defined by the Holy Bible. . . . .
>
> The Hitching Post provides wedding and marriage-related services for the purpose
> of publicly expressing and promoting that marriage is the union of one man and one
> woman, which is consistent with the owners' sincerely held religious beliefs and
> with their ministerial vows.  Any request for wedding and marriage-related services
> not within this identified purpose is outside the scope of services offered by the
> Hitching Post.
>
> The Hitching Post, consistent with its owners' sincerely held religious beliefs,
> provides wedding and marriage-related services also for the purposes of promoting
> the social institution of marriage as a fundamental building block of our society and
> promoting the public understanding of marriage as the union of one man and one
> woman.  By furthering these purposes, the Hitching Post endeavors to instill and
> promote this biblical understanding of marriage and marriage-related values in the
> communities where it operates.  Achieving these goals is important to ensure that

---

[2] Elsewhere within this Memorandum Decision and Order, references are made to, simply, "Hitching Post."  Unless otherwise mentioned, such a reference includes both the D.L.K. Enterprises, Inc. D/B/A the Hitching Post and Hitching Post Weddings, LLC business entities. *See, e.g.*, Pls.' Am. Compl., ¶ 160 (Docket No. 29) ("Hitching Post Weddings, LLC has the same goals that D.L.K. Enterprises, Inc. D/B/A Hitching Post had, and Hitching Post Weddings, LLC operates according to the same religious principles and practices that D.L.K. Enterprises, Inc. D/B/A the Hitching Post operated.").

**MEMORANDUM DECISION AND ORDER - 4**

> marriage remains a vital social institution that uniquely promotes the raising of
> children by their mother and father.

*See* Pls.' Compl., ¶ 163 (Docket No. 29); *see also* Op. Agmt., attached as Ex. 2 to Pls.' First Am.

Compl., ¶ 3.1 (Docket No. 29, Att. 2).  Around that same time, Plaintiffs created new employee

and customer policies, identifying the Hitching Post as a "religious corporation" with a

"religious purpose."  *See* Pls.' Compl., ¶¶ 169-174, 178-181 (Docket No. 29); *see also* Employee

Policy, attached as Ex. 3 to Pls.' First Am. Compl., p. 1 (Docket No. 29, Att. 3) ("The Hitching

Post is a religious corporation . . . .  The purpose of the Hitching Post is to help people create,

celebrate, and build lifetime, monogamous, one-man-one-woman marriages as defined by the

Holy Bible."); Customer Policy, attached as Ex. 4 to Pls.' First Am. Compl., p. 1 (Docket No.

29, Att. 4) ("The Hitching Post is a religious corporation owned by Christian ministers for a

religious purpose.").

       7.     For as long as the Knapps have owned the Hitching Post, the business has never

allowed its ministers to officiate same-sex weddings or commitment ceremonies because doing

so would violate the Knapps' religious beliefs.  *See* Pls.' First Am. Compl., ¶¶ 303, 304, 337.

Mr. Knapp says that since 1989, he has refused to perform same-sex wedding ceremonies at least

15 separate times.  *See id*. at ¶ 306.

**B.**    **Coeur d'Alene City Ordinance § 9.56**

       8.     On June 4, 2013, the city of Coeur d'Alene passed Ordinance § 9.56, which

makes it a misdemeanor crime "[t]o deny to or to discriminate against any person because of

sexual orientation and/or gender identity/expression the full enjoyment of any of the

accommodations, advantages, facilities or privileges of any place of public resort,

**MEMORANDUM DECISION AND ORDER - 5**

accommodation, assemblage, or amusement." *See id.* at ¶¶ 314, 318; *see also* COEUR D'ALENE,

IDAHO ORDINANCES ch. 9.56.030(B).

       9.     The Ordinance defines "place of public resort, accommodation, assemblage, or

amusement" as follows:

> PLACE OF PUBLIC RESORT, ACCOMMODATION, ASSEMBLAGE OR
> AMUSEMENT: Includes, but is not limited to, any public place, licensed or
> unlicensed, kept for gain, hire or reward, or where charges are made for admission,
> service, occupancy or use of any property or facilities, whether conducted for the
> entertainment, housing or lodging of transient guests, or for the benefit, use or
> accommodation of those seeking health, recreation or rest, or for the sale of goods
> and merchandise, or for the rendering of personal services, or for public conveyance
> or transportation on land, water or in the air, including the stations and terminals
> thereof and the garaging of vehicles, or where food or beverages of any kind are sold
> for consumption on the premises, or where public amusement, entertainment, sports
> or recreation of any kind is offered with or without charge, or where medical service
> or care is made available, or where the public gathers, congregates, or assembles for
> amusement, recreation or public purposes, or public halls, public elevators and public
> washrooms of buildings and structures occupied by two (2) or more tenants, or by
> the owner and one or more tenants, or any public library or any educational
> institution wholly or partially supported by public funds, or schools of special
> instruction, or nursery schools, or daycare centers or children's camps; nothing
> herein contained shall be construed to include, or apply to, any institute, bona fide
> club, or place of accommodation, which is by its nature distinctly private, provided
> that where public use is permitted that use shall be covered by this section; nor shall
> anything herein contained apply to any educational facility operated or maintained
> by a bona fide religious or sectarian institution.

Pls.' First Am. Compl., ¶ 319 (Docket No. 29); *see also* COEUR D'ALENE, IDAHO ORDINANCES

ch. 9.56.020. Plaintiffs contend that the Hitching Post is a "public accommodation" under the

Ordinance. *See* Pls.' First Am. Compl., ¶¶ 320-321 (Docket No. 29).

       10.    The Ordinance also contains certain "exceptions," exempting particular entities

from its prohibition on sexual orientation discrimination; and specifically relevant here, the

Ordinance "does not apply to [r]eligious corporations, associations, educational institutions, or

societies." *See id.* at ¶¶ 322, 323; *see also* COEUR D'ALENE, IDAHO ORDINANCES ch.

**MEMORANDUM DECISION AND ORDER - 6**

9.56.040(B)(1).[3]  The Ordinance does not define what constitutes "religious corporations, associations, educational institutions, or societies."  *See* Pls.' First Am. Compl., ¶ 324 (Docket No. 29); *see also generally* COEUR D'ALENE, IDAHO ORDINANCES ch. 9.56.

## C.   The Recent Evolution of Same-Sex Marriage in Idaho

11.     On May 13, 2014, U.S. Magistrate Judge Candy Wagahoff Dale ruled that "Idaho Marriage Laws" (identified as "the Constitution and laws of the State of Idaho") were unconstitutional under the Fourteenth Amendment of the United States Constitution and permanently enjoined the State of Idaho from enforcing its laws to the extent the laws would prohibit same-sex marriage in Idaho or not recognize same-sex marriages celebrated outside Idaho.  *See* Pls.' First Am. Compl., ¶¶ 335, 369 (Docket No. 29); *see also Latta v. Otter*, 19 F. Supp. 3d 1054 (D. Idaho 2014) ("Idaho's Marriage Laws deny its gay and lesbian citizens the fundamental right to marry and relegate their families to a stigmatized, second-class status without sufficient reason for doing so.  These laws do not withstand any applicable level of constitutional scrutiny.").

12.     On May 14, 2014, Judge Dale denied the *Latta* defendants' motion for a stay pending appeal and entered judgment in the *Latta* plaintiffs' favor, consistent with the May 13, 2014 decision.  The *Latta* defendants appealed the decision to the United States Court of Appeals for the Ninth Circuit and, on May 20, 2014, the Ninth Circuit granted a stay pending appeal.  *See* Pls.' First Am. Compl., ¶ 370.

---

[3]  From the Court's perspective, there is no practical difference on this record (or, if so, any difference of any legal consequence) between being "exempt from" or "excepted from" a particular application, noting that the parties appear to have used such terminology interchangeably in both their briefing and during oral argument.  Therefore, this Memorandum Decision and Order's also uses such terms interchangeably.

**MEMORANDUM DECISION AND ORDER - 7**

13.     On October 7, 2014, the Ninth Circuit affirmed Judge Dale's decision in *Latta*.

*See id*. The Ninth Circuit reasoned:

> Idaho['s] . . . marriage laws, by preventing same-sex couples from marrying and refusing to recognize same-sex marriages celebrated elsewhere, impose profound legal, financial, social and psychic harms on numerous citizens of those states. These harms are not inflicted on opposite-sex couples, who may, if they wish, enjoy the rights and assume the responsibilities of marriage.  Laws that treat people differently based on sexual orientation are unconstitutional unless a "legitimate purpose . . . overcome[s]" the injury inflicted by the law on lesbians and gays and their families. . . . .  Because defendants have failed to demonstrate that these laws further any legitimate purpose, they unjustifiably discriminate on the basis of sexual orientation, and are in violation of the Equal Protection Clause.

*Latta v. Otter*, 771 F.3d 456, 476 (9th Cir. 2014) (internal citations omitted); *see also* Pls.' Am. Compl., ¶ 371 (Docket No. 29).

14.     Upon application by *Latta's* defendants, on October 8, 2014, the Supreme Court temporarily stayed the Ninth Circuit's mandate in *Latta*; that same day, the Ninth Circuit withdrew its mandate, pending further order of the Ninth Circuit or the Supreme Court.  *See* Pls.' Am. Compl., ¶ 374 (Docket No. 29).

15.     On October 10, 2014, the Supreme Court formally denied the application for stay, effectively vacating its October 8, 2014 order staying the proceedings; that same day, *Latta's* plaintiffs moved for dissolution of the May 20, 2014 stay pending appeal.  *See id*. at ¶ 375.

16.     On October 13, 2014, the Ninth Circuit granted the *Latta* plaintiffs' motion to dissolve the May 20, 2014 stay pending appeal, effective at 9 a.m. on October 15, 2014 (effectively allowing county clerks throughout Idaho to issue marriage licenses to same-sex couples as of October 15, 2014).  *See id*. at ¶¶ 376-377.

17.     On October 15, 2014, the Ninth Circuit ruled that the *Latta* defendants were no longer entitled to a stay of this Court's May 13, 2014 order.  *See Latta v. Otter*, 771 F.3d 496 (9th

**MEMORANDUM DECISION AND ORDER - 8**

Cir. 2014) (finding support, in part, on Supreme Court's October 6, 2014 decision to deny

review of seven petitions arising from lower court decisions striking down bans on same-sex

marriage in Indiana, Wisconsin, Utah, Oklahoma, and Virginia).  Even so, the Ninth Circuit

afforded the *Latta* defendants a second opportunity to obtain an emergency stay from the

Supreme Court.  *Id*. at 501.[4]

18.    On October 21, 2014, the *Latta* defendants filed a petition for rehearing en banc

with the Ninth Circuit.

19.    On November 6, 2014, the United States Court of Appeals for the Sixth Circuit

reversed five consolidated district court cases upholding challenges to marriage restrictions on

same-sex couples in four Sixth Circuit states.  *See DeBoer v. Snyder*, 772 F.3d 388 (6th Cir.

2014) (holding that involved states have no constitutional obligation to license same-sex

marriages or to recognize same-sex marriages performed out-of-state).[5]  Soon thereafter, the

plaintiffs in the underlying district court cases submitted petitions for certiorari, requesting that

the Supreme Court review the Sixth Circuit's decision.

20.    On December 30, 2014 and January 1, 2015, the *Latta* defendants submitted

petitions for certiorari, requesting that the Supreme Court review the Ninth Circuit's October 7,

2014 judgment affirming Judge Dale's May 13, 2014 decision in *Latta*.

---

[4]  It does not appear that the *Latta* defendants ever attempted to obtain a second
emergency stay from the Supreme Court.

[5]  Michigan, Kentucky, Ohio, and Tennessee defined marriage as a union between one
man and one woman.  The plaintiffs in those cases (two cases from Ohio) filed suits in federal
district courts in their home states, claiming that the defendant state officials violated the
Fourteenth Amendment to the United States Constitution by denying them the right to marry or
to have marriages lawfully performed in another state given full recognition.  Each district court
ruled in the plaintiffs' favor, but, on the defendants' appeal, the Sixth Circuit consolidated the
cases and reversed the judgments of the district courts.

**MEMORANDUM DECISION AND ORDER - 9**

21.     On January 9, 2015, the Ninth Circuit denied the *Latta* defendants' petition for rehearing en banc.

22.     On January 16, 2015, the Supreme Court granted review of the Sixth Circuit's November 6, 2014 decision in *DeBoer*, limited to these questions: (1) whether the Fourteenth Amendment requires a state to license a marriage between two people of the same sex; and (2) whether the Fourteenth Amendment requires a state to recognize a same-sex marriage licensed and performed in a state which does grant that right.

23.     On January 21, 2015, the Ninth Circuit issued a mandate, stating that its October 7, 2014 judgment affirming Judge Dale's decision in *Latta* became effective that same date.

24.     On June 26, 2015, the Supreme Court reversed the Sixth Circuit in *DeBoer*, holding that the Fourteenth Amendment requires a state to license a marriage between same-sex couples and to recognize a same-sex marriage lawfully licensed and performed out-of-state. *See Obergefell v. Hodges*, ___ U.S. ___, 135 S.Ct. 2584 (2015). In doing so, Justice Kennedy, writing for the majority, concluded:

> No union is more profound than marriage, for it embodies the highest ideals of love, fidelity, devotion, sacrifice, and family. In forming a marital union, two people become something greater than once they were. As some of the petitioners in these cases demonstrate, marriage embodies a love that may endure even past death. It would misunderstand these men and women to say they disrespect the idea of marriage. Their plea is that they do respect it, respect it so deeply that they seek to find its fulfillment for themselves. Their hope is not to be condemned to live in loneliness, excluded from one of civilization's oldest institutions. They ask for equal dignity in the eyes of the law. The Constitution grants them that right.

*Id*. at 2608.

25.     On June 30, 2015, consistent with its holding in *Obergefell*, the Supreme Court denied the *Latta* defendants' December 30, 2014 and January 1, 2015 petitions for certiorari.

**MEMORANDUM DECISION AND ORDER - 10**

**D.      The Knapps, Hitching Post, and Ordinance § 9.56 in the Wake of *Latta***

26.     After learning that the Ninth Circuit affirmed Judge Dale's decision in *Latta*, the Knapps closed the Hitching Post on October 7 and 8, 2014, claiming that they had been informed by the City that they would be in violation of the Ordinance.  *See* First Am. Compl., ¶ 372 (Docket No. 29).  For these same reasons, the Knapps kept the Hitching Post closed on  October 9, 10, 11, 14, and 15, 2014 as well.  *See id*. at ¶ 378.  The Knapps claim they lost clients on October 7, 8, 9, 10, 11, 14, and 15, 2015 and therefore lost income on these same days.  *See id*. at ¶¶ 373, 379, 437.

27.     On October 16, 2014, the Knapps re-opened the Hitching Post, but declined requests to perform any same-sex wedding ceremonies due to their sincerely held religious convictions and ministerial vows.  *See id*. at ¶¶ 383-390.  The Knapps and the Hitching Post continue to decline requests to perform same-sex wedding and commitment ceremonies.  *See id*. at ¶¶ 304-306, 393, 395-407, 412-427.

28.     On October 17, 2014, the Knapps filed this lawsuit as well as a motion for a temporary restraining order, alleging that (1) the City repeatedly informed them that the Ordinance applies to the Hitching Post, and (2) they had consistently declined to perform same-sex wedding ceremonies,.  *See id*. at ¶ 391, 392; *see also* Compl. (Docket No. 1); Mot. for TRO (Docket No. 3).

29.     Since this action's filing, the City has not enforced the Ordinance against either the Knapps or the Hitching Post.  *See* First Am. Compl., ¶ 428 (Docket No. 29).  Still, the Knapps claim to be in a "constant state of fear" that they may one day have to go to jail and/or pay substantial fines if they or the Hitching Post is determined to have violated the Ordinance.

**MEMORANDUM DECISION AND ORDER - 11**

*See id.* at ¶¶ 429-432.  According to the Knapps, they cannot effectively plan the Hitching Post's

business because of this imminent threat of prosecution.  *See id.* at ¶¶ 433-436.

   30. On October 20, 2014, Coeur d'Alene City Attorney Michael Gridley sent a letter

to Plaintiffs' counsel, addressing the allegations made in Plaintiffs' original Complaint.[6]  *See id.*

at ¶¶ 38, 443.  Mr. Gridley's letter states in relevant part:

> I am the city attorney for the City of Coeur d'Alene, Idaho.  As we discussed today
> by telephone I have reviewed the 63 page complaint and the attached exhibits filed
> by your clients in their lawsuit against the City.  While I appreciate your clients'
> concerns, it appears from the documents filed in their lawsuit that they are claiming
> to be operating a "religious corporation."  If they are truly operating a not-for-profit
> religious corporation they would be **specifically exempted** from the City's anti-
> discrimination ordinance, Municipal Code 9.56.010 et seq.
>
> My office has responded to questions from your clients in the past and told them that,
> based on the facts presented and their corporate status at the time, they would likely
> be governed by the anti-discrimination ordinance if a complaint was made against
> them.  Their lawsuit was something of a surprise because we have had cordial
> conversations with them in the past and they have never disclosed that they have
> recently become a religious corporation.  However it now appears that on or about
> October 6, 2014, they filed with the Idaho Secretary of State as a religious
> corporation.  These are new facts.  If they are operating as a legitimate not-for-profit
> religious corporation then they are exempt from the ordinance like any other church
> or religious association.  On the other hand, if they are providing services primarily
> or substantially for profit and they discriminate in providing those services based on
> sexual orientation then they would likely be in violation of the ordinance.
>
> I want to be clear that absent a change in the City's anti-discrimination ordinance or
> other applicable state or federal law, the City will not prosecute legitimate, nonprofit
> religious corporations, associations, educational institutions, or societies or other
> exempt organizations or anyone else as a result of their lawful exercise of their first
> amendment rights of freedom of speech and religion.  In addition to specifically
> exempting religious corporations, associations, educational institutions, and
> societies, section 9.56.040 of the anti-discrimination ordinance state that the
> ordinance **"shall be construed and applied in a manner consistent with first**

---

  [6]  After multiple stays in the action and an earlier motion to dismiss, Plaintiffs filed their
First Amended Complaint on March 16, 2015.  *See* Stay Orders (Docket Nos. 16, 20, 22); *see
also* Mot. to Dismiss (Docket No. 24); Pls.' First Am. Compl. (Docket No. 29); *infra.*

**MEMORANDUM DECISION AND ORDER - 12**

**amendment jurisprudence regarding the freedom of speech and exercise of religion.”**

> I believe that given the current facts your clients' lawsuit is premature and not ripe for adjudication. As such, I would ask that you review this letter with your clients and urge them to dismiss their lawsuit before any more time and resources are expended. Please call me if you have any questions.

10/20/14 Ltr. from Gridley to Cortman, attached as Ex. 1 to Pls.' First Am. Compl. (Docket No. 29, Att. 1) (emphasis in original).[7]

> 31.     On October 9, 2014, Mr. Gridley sent a second letter to Plaintiffs' counsel. *See* Pls.' First Am. Compl., ¶ 458 (Docket No. 29).[8] Mr. Gridley's letter states in relevant part:

> This letter is intended as clarification of my letter to you on October 20, 2014 regarding the above referenced case.

> Based on the facts presented to the city by your clients' pleadings in the above referenced lawsuit and further review and analysis of the city's anti-discrimination ordinance (MC 9.56.010, et seq.) It is my opinion and the city's position that as currently represented, the conduct by the Hitching Post Weddings L.L.C. is exempt from the requirements of the ordinance and would not be subject to prosecution under the ordinance if a complaint was received by the city.

> Please contact me if you have any questions.

10/23/14 Ltr. from Gridley to Cortman, attached as Ex. 9 to Pls.' First Am. Compl. (Docket No. 29, Att. 9).

---

[7] Plaintiffs claim that the for-profit/not-for-profit distinction raised within Mr. Gridley's October 20, 2014 letter is consistent with earlier representations made by Coeur d'Alene Deputy City Attorney Warren Wilson to media outlets in May 2014 (after Judge Dale's May 13, 2014 *Latta* decision). *See* Pls.' First Am. Compl., ¶¶ 6, 7, 338-360, 442 (Docket No. 29) (“ . . . Coeur d'Alene stated that Ordinance § 9.56 applies to for-profit business (like the Hitching Post) – the same interpretation the City communicated many times publicly and personally to the Knapps in the past.”). Following such representations, Mr. Knapp called the Coeur d'Alene City Attorney's Office on two separate occasions to clarify whether the Ordinance applied to the Hitching Post. *See id.* at ¶¶ 9-13, 21-24, 366. Plaintiffs assert that they were told that they and the Hitching Post would violate the Ordinance and be subject to jail time and criminal fines if they declined to perform same-sex wedding ceremonies. *See id.* at ¶¶ 14-19, 25-27, 367.

[8] Plaintiffs imply that this second letter followed public outcry to Mr. Gridley's October 20, 2014 letter. *See* Pls.' First Am. Compl., ¶¶ 449-457 (Docket No. 29).

**MEMORANDUM DECISION AND ORDER - 13**

32.     On March 16, 2015, Plaintiffs filed their First Amended Complaint against the

City, alleging in part:

> The First Amendment does not allow the government to force regular citizens or
> religious corporations much less ordained ministers to choose between suffering
> escalating fines and jail time for following their religious beliefs and ordination vows
> or forsaking their religious beliefs and ordination vows and perform same-sex
> wedding ceremonies.  But that is exactly the choice  City Ordinance § 9.56 required,
> and is still requiring, the Knapps to make.   For these reasons, the Knapps and
> Hitching Post Weddings, LLC ask this Court to award them compensatory damages
> for the days they were forced to close due to the City's threats to enforce Ordinance
> § 9.56 against them, and to enjoin the Ordinance and declare it unconstitutional as
> applied to them because this application violates the Free Speech Clause, the Free
> Exercise Clause, the Equal Protection Clause, the Due Process Clause, and Idaho's
> Free Exercise of Religion Protected Act.

Pls.' First Am. Compl., ¶ 45 (Docket No. 29).  In turn, Plaintiffs assert the following causes of

action: (1) "Violation of Plaintiffs' First Amendment Right to Freedom of Speech: Compelled

Speech, Viewpoint Discrimination, Unconstitutional Conditions, and Unbridled Discretion"

(First Cause of Action); (2) "Violation of Plaintiffs' First Amendment Right to Free Exercise of

Religion" (Second Cause of Action); (3) "Violation of Plaintiffs' Rights Under the Idaho Free

Exercise of Religion Protected Act (FERPA)" (Third Cause of Action); (4) "Violation of

Plaintiffs' Fourteenth Amendment Right to Equal Protection" (Fourth Cause of Action); and (5)

"Violation of Plaintiffs' Fourteenth Amendment Right to Due Process" (Fifth Cause of Action).

*See id*. at ¶¶ 493-594; *see also supra*.

33.     On March 30, 2015, the City filed the at-issue Motion to Dismiss, arguing that

Plaintiffs' First Amended Complaint should be dismissed because they lack standing and their

claims are not ripe for review.  *See* MTD, p. 1 (Docket No. 31).  More to the point, the City

submits that, because the Hitching Post qualifies as a religious corporation, it is exempt from its

mandate; and, because the Ordinance does not apply to the Hitching Post or the Knapps, they

**MEMORANDUM DECISION AND ORDER - 14**

necessarily lack standing to bring this lawsuit and their claims are not ripe for review.  *See* Mem. in Supp. of MTD, pp. 2, 9-20 (Docket No. 31, Att. 1).

### III.  TIMELINE OF IMPORTANT EVENTS

As apparent from the factual background, there are many moving parts to this dispute. Hence, the Court will crystallize here the above-referenced factual backdrop into the following timeline, outlining the most integral events which inform the issues raised within Plaintiffs' First Amended Complaint and by Defendant's Motion to Dismiss:

| Date | Event |
|---|---|
| 1989 | The Knapps purchase the Hitching Post, creating a new corporation in Washington named D.L.K. Enterprises, Inc.  The Knapps incorporate D.L.K. Enterprises, Inc. D/B/A the Hitching Post as a "profit corporation" under Washington law. |
| June 4, 2013 | The City of Coeur d'Alene passes Ordinance § 9.56. |
| May 13, 2014 | Judge Dale invalidates the Idaho laws defining marriage as the union between a man and a woman in *Latta v. Otter*. |
| May/June 2014 | The City indicates to media outlets and to Mr. Knapp that the Ordinance applies to places of public accommodation, including the Hitching Post. |
| September 12, 2014 | The Knapps create a new business entity – Hitching Post Weddings, LLC – by filing a certificate of organization with the Idaho Secretary of State. Hitching Post, LLC is a for-profit corporation. |
| October 6, 2014 | The Knapps execute an "Operating Agreement" and new employee and customer policies, identifying the Hitching Post as a "religious corporation" with a "religious purpose." |
| October 7, 2014 | The Ninth Circuit affirms *Latta*. |
| October 7-11, 14-15, 2014 | The Hitching Post closes. |
| October 15, 2014 | County clerks throughout Idaho are permitted to issue marriage licenses to same-sex couples. |

**MEMORANDUM DECISION AND ORDER - 15**

| October 16, 2014 | The Hitching Post re-opens. |
|---|---|
| October 17, 2014 | Plaintiffs file their original Complaint against the City. |
| October 20, 2014 | Coeur d'Alene City Attorney Michael Gridley writes his first letter to Plaintiffs' counsel. |
| October 23, 2014 | Coeur d'Alene City Attorney Michael Gridley writes his second letter to Plaintiffs' counsel. |
| March 16, 2015 | Plaintiffs file their First Amended Complaint against the City. |

## IV.  DISCUSSION

**A.    Legal Standards: Standing and Ripeness**

Article III of the Constitution confines the work of a federal court to adjudication of actual "cases" or "controversies."  *Valley Forge Christian Coll. v. Americans United for Separate of Church and State, Inc.*, 454 U.S. 464, 471 (1982).  To satisfy Article III's "case" and "controversy" requirement, a plaintiff must have standing to bring the complaint, and the claims asserted must be "ripe for review."  *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  The City's Motion to Dismiss raises both standing and ripeness issues.

The focus of an Article III standing analysis rests "on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated."  *Flast v. Cohen*, 392 U.S. 83, 99 (1968).  To establish standing under Article III, the party in question must prove: (1) an injury-in-fact that is concrete and particularized, and actual or imminent; (2) a fairly traceable causal connection between the injury alleged and the conduct in dispute; and (3) a sufficient likelihood that the relief sought will redress the injury.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).[9]

---

[9]  In addition to these constitutional requirements, courts must also consider a prudential component to standing.  "[P]rudential standing . . . embodies judicially self-imposed limits on

**MEMORANDUM DECISION AND ORDER - 16**

As a corollary to the standing requirement, the claim itself must be ripe for review.  The "ripeness inquiry is often treated under the rubric of standing,"  and "in many cases, ripeness coincides squarely with standing's injury-in-fact prong."  *Thomas v. Anchorage Equal Rights Com'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).  Indeed, ripeness can be understood as standing on a timeline.  *See id.* ("Ripeness is peculiarly a question of timing, designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.  Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution.") (internal quotation marks and citations omitted).  "And, in measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing."  *Id.* (internal quotation marks omitted).

To determine whether a case is ripe, courts consider two factors: (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties stemming from the withholding of court consideration.  *See Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1179 (9th Cir. 2010).

———————————————

the exercise of federal jurisdiction."  *Id.* (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (internal quotation marks omitted)).  These limits include "the general prohibition on a litigant's raising another person's legal rights . . . ."  *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)); *see also Alaska Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840, 848-49 (9th Cir. 2007) ("[P]rudential standing concerns require that we consider, for example, whether the alleged injury is more than a 'mere generalized grievance,' whether the plaintiff is asserting her own rights or the rights of third parties, and whether the claim 'falls within the zone of interests to be protected or regulated by the constitutional guarantee in question.'") (quoting *Johnson v. Stuart*, 702 F.2d 193, 196 (9th Cir. 1983)).

**MEMORANDUM DECISION AND ORDER - 17**

**B.      Plaintiffs' Standing to Bring Claims for Economic Injury and a Pre-Enforcement Challenge to the Ordinance**

The allegations contained within Plaintiffs' First Amended Complaint unquestionably describe important constitutional issues that arouse sincere and strongly-held convictions among various cross-sections of the public.  Nevertheless, it is important to keep in mind what this Memorandum Decision and Order speaks to, and what it does not.

To be clear, the substantive legal merits of Plaintiffs' underlying allegations and the corresponding reactions arising therefrom are *not* addressed here.  Instead, before even reaching such a juncture, the question of whether Plaintiffs have standing to bring the claims asserted in their First Amended Complaint must be answered.  *See supra*.  It is in this latter, more fundamental respect, that this Memorandum Decision and Order *is* focused upon.

Framed thusly, it is worth reiterating that even though the background of this case dates back to 1989 (when the Knapps first purchased the Hitching Post), the actual time period giving rise to Plaintiffs' particular claims is a relatively short one – only 16 days (the period from October 7, 2014 when Plaintiffs closed the Hitching Post, to October 23, 2014 when City Attorney Michael Gridley wrote his second letter to Plaintiffs' counsel).  During that time, neither the Knapps nor the Hitching Post was ever cited or prosecuted pursuant to the Ordinance.  Even so, Plaintiffs contend that they have standing to (1) seek compensatory damages for the seven days the Hitching Post was closed, owing to the City's alleged threats (both public and private) to enforce the Ordinance and prosecute the Knapps for following their religious convictions and refusing to perform same-sex wedding ceremonies; and (2) prospectively enjoin enforcement of the Ordinance as unconstitutional.  Each of these arguments vis à vis standing responds to Defendant's Motion to Dismiss and is addressed in turn below.

**MEMORANDUM DECISION AND ORDER - 18**

1.      Plaintiffs Have Standing to Bring Claims for Certain Economic Injuries

"[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing." *Sierra Club v. Morton*, 405 U.S. 727, 733-34 (1972); *see also San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) ("Economic injury is clearly a sufficient basis for standing."). As with any injury that is alleged for purposes of establishing standing for purposes, economic injuries must be "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Central Arizona Water Conservation Dist. v. United States Envtl. Prot. Agency*, 990 F.2d 1531, 1537 (9th Cir. 1993); *see also National Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 856 (9th Cir. 2002) (economic harm must be "actual, discrete, and direct."). Here, Plaintiffs – as the members, owners, and operators of the Hitching Post – contend that, due to the City's alleged threat to enforce the Ordinance against them, they had no choice but to close the Hitching Post for seven days in October 2014 to avoid being prosecuted. *See* Opp. to MTD, pp. 8-9 (Docket No. 33) (citing Pls.' First Am. Compl., ¶ 372 (Docket No. 29)). Further, according to Plaintiffs, for each day the Hitching Post was closed, they lost income. *See id.* at p. 9 (citing Pls.' First Am. Compl., ¶¶ 373, 378-79 (Docket No. 29)).

The City does not dispute that lost income can represent an injury-in-fact for the purposes of conferring Article III standing. Rather, the City argues that Plaintiffs' alleged economic injuries are speculative and without the requisite level of particularity. *See* Mem. in Supp. of MTD, p. 13 (Docket No. 31, Att. 1) ("Plaintiffs never allege that they had any weddings scheduled on those dates, or that anybody came to their business requesting a wedding on those dates. Instead, their allegation is purely speculative and hypothetical. Plaintiffs merely assume that they would have had a customer had they remained open."). The undersigned disagrees.

**MEMORANDUM DECISION AND ORDER - 19**

For purposes of deciding the City's Motion to Dismiss, Plaintiffs' allegations that they lost business and income as a result of being closed for seven days must be accepted as true. *See City of Los Angeles v. JPMorgan Chase & Co.*, 22 F. Supp. 3d 1047 (C.D. Cal. 2014) ("When a motion to dismiss attacks subject-matter jurisdiction under Rule 12(b)(1) on the face of the complaint, the court assumes the factual allegations in the complaint are true and draws all reasonable inferences in plaintiff's favor.") (citing *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009)).  Besides, it does not stretch the boundaries of reasonableness to conclude that, in closing for seven days an otherwise open and operating business catering in part to walk-in trade, lost income would understandably follow. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (in terms of Article III standing, complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plaintiffs have sufficiently alleged an injury-in-fact in the form of economic injury and therefore have satisfied the first prong of Article III standing.

Article III's second prong – a fairly traceable causal connection between Plaintiffs' alleged economic injury and the City's alleged conduct – is more problematic.  Not surprisingly, the parties are in significant disagreement on this issue.  On one hand, the City argues that between May 2014 and early September 2014, it had no reason to believe that the Hitching Post was a religious corporation excepted from the Ordinance. *See* Mem. in Supp. of MTD, p. 3 (Docket No. 31, Att. 1) ("At the time, city officials had no knowledge or information which would lead them to believe that the Knapps operated a 'religious corporation.'  In fact, the Knapps still operated the Hitching Post as the S-Corporation and had not yet memorialized their purpose, character, ethos, and goals.").  Hence, during this period of time, the City argues that it

**MEMORANDUM DECISION AND ORDER - 20**

reasonably commented that the Ordinance applies to places of public accommodation, such as, for instance, the Hitching Post, in the event same-sex marriages were to be made legal by decision of the courts.  *See id*.  The City then contends that it was unaware that the Knapps created a new business entity around September 12, 2014, and, around October 6, 2014, took further action intending to confirm that the Hitching Post's purpose was, at least in part, to promote biblical marriages (intending, it would seem, to seek a safe harbor under the Ordinance as a religious corporation by virtue of its Operating Agreement and employee/customer policies). *See id*. at pp. 4-5, 13-14.  The ultimate result of such acts, according to the City, was that the Hitching Post was obviously a religious corporation exempt from the Ordinance as of October 6, 2014, such that any decision to close for business thereafter was a unilateral decision of the Knapps, independent of any actual or perceived threat on the City's part to prosecute Plaintiffs for violating the Ordinance.  *See id*. at pp. 5, 14.

On the other hand, Plaintiffs take issue with the City's back-in-time assessment of the record.  Plaintiffs assert that to now claim in a motion to dismiss that the Hitching Post was a religious corporation as of October 6, 2014 (and therefore absolutely not subject to the Ordinance as of that same date) ignores what *actually* took place during this time and which prompted the Knapps to close the Hitching Post for seven days beginning on October 7, 2015. According to Plaintiffs, the City squarely positioned the Hitching Post within the cross-hairs of the Ordinance in May and June of 2014, when the City indicated that for-profit wedding chapels like the Hitching Post would be in violation of the Ordinance if they declined to perform same-sex wedding ceremonies should same-sex marriage become legal.  *See* Opp. to MTD, pp. 1-4 (Docket No. 33).  Hence, the Knapps contend, they did what any reasonable business owner

**MEMORANDUM DECISION AND ORDER - 21**

would have done; they closed down the Hitching Post on October 7, 2014 when the Ninth

Circuit affirmed *Latta*. *See id*. at p. 1 ("The City cannot now disclaim responsibility for causing

the Knapps to close the Hitching Post given that, in addition to the threats of criminal liability,

the city made clear multiple times that it is the Hitching Post's status as a *for-profit* corporation

that makes them subject to [Ordinance] § 9.56.") (emphasis in original).

In this setting, the City's position that Plaintiffs received no threats of prosecution

leading up to October 7, 2014 is not persuasive.  The allegations contained within the First

Amended Complaint plausibly describe that Plaintiffs believed that they faced prosecution under

the Ordinance based upon what the City had said in May and June of 2014 (comments made by

City employees to the media and in telephone conversations with Mr. Knapp himself).  That the

City may not have been completely aware of (or more fully scrutinized) the apparent religious

underpinnings of the Hitching Post's business plan may explain the City's frame-of-mind when

taking the positions it did leading up to October 7, 2014; however, such a misunderstanding

cannot insulate it from any argument that its conduct led to the Knapps' decision to close the

Hitching Post.  And, significantly, while the City now claims that the Hitching Post was a

religious corporation exempt from the Ordinance as of October 6, 2014,[10] nothing in the record

indicates that it ever made this position clearly known to anyone – at least not before Mr.

Gridley's second letter dated October 23, 2014.  In fact, Mr. Gridley's first letter of October 20,

2014 carries a reasonable inference at the minimum that Plaintiffs could be prosecuted under the

---

[10]  Separately, this position ignores any distinction the City may have made at that time about for-profit religious corporations and not-for-profit religious corporations.  *See, e.g.*, *See* 10/20/14 Ltr. from Gridley to Cortman, attached as Ex. 1 to Pls.' First Am. Compl. (Docket No. 29, Att. 1); *but see* Gridley Decl., ¶ 10 (Docket No. 31, Att. 2) (indicating that Hitching Post's for-profit status "did not alter my conclusion that Plaintiffs operated a religious corporation exempt from the ordinance.").

**MEMORANDUM DECISION AND ORDER - 22**

Ordinance – even after the Hitching Post had closed down for seven days and re-opened on October 16, 2014 – particularly in its reference to "if they are *truly* operating...as a *legitimate* not-for-profit religious corporation...." (Emphasis supplied.)  *See* 10/20/14 Ltr. from Gridley to Cortman, attached as Ex. 1 to Pls.' First Am. Compl. (Docket No. 29, Att. 1) ("*If they are truly operating a not-for-profit religious corporation* they would be **specifically exempted** from the City's anti-discrimination ordinance . . . .  *If they are operating as a legitimate not-for-profit religious corporation then they are exempt from the ordinance like any other church or religious association.  On the other hand, if they are providing services primarily or substantially for profit and they discriminate in providing those services based on sexual orientation then they would likely be in violation of the ordinance*.") (bold in original, italics added).[11]

At best, until October 23, 2014, the City's position on whether the Ordinance applied to Plaintiffs was less than clear.  *See, e.g.*, Gridley Decl., ¶ 10 (Docket No. 31, Att. 2) ("[R]ecognizing that my first letter may have caused confusion, I sent a second letter to Plaintiffs' attorney on October 23, 2014 . . ., clarifying that Plaintiffs were exempt from the anti-discrimination ordinance and would not be subject to prosecution under the ordinance.").

At the same time, Plaintiffs' arguments are not without their own peculiarities that, alongside the City's sometimes problematic arguments (*see supra*), create the entire lens through which this action is viewed.  To begin, in the month immediately preceding the Hitching Post's closing, the Knapps created a new business entity and executed documents explicitly identifying

---

[11]  Plaintiffs point to Mr. Gridley's two letters as evidence of the City's threats to prosecute them under the Ordinance.  *See, e.g.*, Opp. to MTD, pp. 5-6, 13-16 (Docket No. 33). The connection is absent, however, as it would have been impossible for these later-in-time letters to have been part of the Knapps' decision to close the Hitching Post on October 7, 2014. Nonetheless, these letters are helpful at testing the City's characterization of threats directed at Plaintiffs.

**MEMORANDUM DECISION AND ORDER - 23**

the Hitching Post as a religious corporation with a religious purpose.  Yet, the Knapps never

informed the City of these actions, even though Mr. Knapp's had telephone conversations with

City employees in May and June of 2014 about the City's view of the Ordinance and its impact

upon the Hitching Post.  By not bringing such information to the attention of the City at that

time, the Knapps arguably chose to forgo the possibility of an informal resolution (after a more

thorough examination of the changed procedural and legal landscape).  Instead, they decided to

close the Hitching Post – yet, they did so on the day after the Hitching Post formalized its status

as a religious corporation and described its religious purpose.

Of course, Plaintiffs were not obligated to convey such information to the City and their

decision not to do so does not direct the Court's decision as to the merits of Defendant's Motion

to Dismiss.  But, even so, Plaintiffs' own conduct and motivations during this time are not

without their own set of questions.  Nonetheless, any such concerns do not overcome the fact

that, when accepting the allegations raised within Plaintiffs' First Amended Complaint as true,

Plaintiffs plausibly have identified conduct on the part of the City that allegedly contributed to

the Knapps' decision to close the Hitching Post which, in turn, allegedly caused Plaintiffs to

suffer economic losses.

The inquiry, however, has yet more layers.  Plaintiffs seek compensatory damages for the

seven days the Hitching Post was closed.  However, as the City emphasizes, same-sex marriage

was not legal in Idaho until October 15, 2014 at 9 a.m. – after the Ninth Circuit granted the *Latta*

plaintiffs' motion to dissolve the then-pending May 20, 2014 stay pending appeal.  *See* Mem. in

Supp. of MTD, p. 14 (Docket No. 31, Att. 1).  In other words, even if the Ordinance applied to

Plaintiffs, there could have been no violation (by anyone) for refusing to officiate same-sex

wedding ceremonies *until* October 15, 2014.  Accordingly, Plaintiffs could not  have violated the

**MEMORANDUM DECISION AND ORDER - 24**

Ordinance by refusing to officiate same-sex wedding ceremonies on October 7, 8, 9, 10, 11, and 14, 2014.  Their claim was not factually choate until October 15, 2014, and therefore their claim for economic injury allegedly caused by the City's alleged conduct could only exist as of that same date.

Hence, Plaintiffs have standing to bring such a claim for economic injury, but it is limited to that single day of October 15, 2014; in this respect, the City's Motion to Dismiss is denied. However, Plaintiffs do not have standing to bring a claim for economic injuries on October 7, 8, 9, 10, 11, and 14, 2014; in this respect, the City's Motion to Dismiss is granted.

2.     Plaintiffs Do Not Have Standing to Bring a Pre-Enforcement Challenge to the Ordinance

In the context of establishing standing, the Supreme Court has explained that "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see also Libertarian Party v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013).  Still, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough."  *Babbitt*, 442 U.S. at 298.

First Amendment challenges, like Plaintiffs' pre-enforcement challenge here, "present unique standing considerations" such that "the inquiry tilts dramatically toward a finding of standing."  *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (internal quotation marks omitted).  That is so because, as the Supreme Court recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury. *Id.*; *see also Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010) ("[W]hen a challenged statute risks chilling the exercise of First Amendment rights, the Supreme

**MEMORANDUM DECISION AND ORDER - 25**

Court has dispensed with rigid standing requirements and recognized 'self-censorship' as a harm that can be realized even without an actual prosecution.") (citations and internal quotation marks omitted).  "[W]here a plaintiff has refrained from engaging in expressive activity for fear of prosecution under the challenged statute, such self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the challenged statute will be enforced." *Human Life*, 624 F.3d at 1001 (internal quotation marks omitted).

To satisfy Article III's injury-in fact requirement (*see supra*), courts must evaluate whether a claimed threat of prosecution is genuine.  Doing so requires the examination of three factors: "(1) whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the challenged statute." *McCormack v. Hiedeman*, 694 F.3d 1004, 1021 (9th Cir. 2012) (internal quotation marks omitted).  Each of these factors weighs against a finding that Plaintiffs have standing to bring a pre-enforcement challenge to the Ordinance.

First, the Knapps' insistence that they will refuse to perform same-sex wedding ceremonies does not describe a "concrete plan" to violate the Ordinance.  *See* Opp. to MTD, pp. 10-11 (Docket No. 33) ("[Plaintiffs] continue to receive and decline specific requests to perform same-sex wedding ceremonies, thus leaving no doubt that they will violate § 9.56 in the future.").  To the contrary, where the City does not dispute Plaintiffs' status as meeting the safe harbor of a "religious corporation" under the Ordinance (*see supra*), the fact that Plaintiffs do not (and will not) perform same-sex wedding ceremonies does not amount to a violation (or a plan to

**MEMORANDUM DECISION AND ORDER - 26**

violate) the Ordinance.  Simply put, there is no past or future actionable violation of the

Ordinance on these facts given the Knapps' assertion that their business if a religious corporation

under the Ordinance, and the City's stipulation to the same upon the facts of this case.[12]

Plaintiffs' concern that the Hitching Post's protected status may change in the future (to the point

that it would then be unequivocally violating the Ordinance) is not sufficiently actual or

imminent.  *See id*. at pp. 3, 6, 11-12, 15-16, 19 (arguing that the City has "flip-flopped" on

question of wether Hitching Post is religious corporation exempt from the Ordinance).  It is true

that the City's position as to the Hitching Post's status as a protected religious corporation under

the Ordinance can be characterized as a position that has evolved over time.  *See supra*.

However, the Court is satisfied that such an evolution reflects only the unsettled nature of events

surrounding both the Hitching Post's identity and purpose as it pertained to the manner in which

the Ordinance would apply to their business operations as of Fall 2014.  Such a denouement in

the City's legal position – premised as it was upon imperfect fact-gathering and arguably

reflexive legal analysis – is hardly unusual.  As such, and on this record, that change does not

cast into doubt and unwind the City's ultimate decision on the issue.  The fact remains that since

Mr. Gridley's October 23, 2014 letter to Plaintiffs' counsel, there has been no suggestion that

---

[12]  The Court does not adopt Plaintiffs' strict position that, even though the Hitching Post may be an excepted religious corporation, it nonetheless violates the Ordinance when it refuses to officiate same-sex wedding ceremonies.  *See* Opp. to MTD, p. 11 (Docket No. 33) ("It is plain that the Knapps *violate* the ordinance when they decline to perform a same-sex ceremony because they are a for-profit business, a fact the city confirmed multiple times both before and after the lawsuit was filed.  It is a separate question whether an organization is *exempt* from the organization.") (emphasis in original).  Any technical distinction in this regard still does not amount to the sort of concrete plan to violate the Ordinance that would be required in order for Plaintiffs to pursue a pre-enforcement challenge here.  Even if incorrect, other factors apply to preclude Plaintiffs' standing to pursue their pre-enforcement challenge.  *See infra*.

**MEMORANDUM DECISION AND ORDER - 27**

Plaintiffs do not *remain* an excepted religious corporation under the Ordinance.[13]  As a result,

there can be no legitimate "concrete plan" to violate the Ordinance.

Second, it likewise cannot be said that prosecuting authorities have communicated a

specific warning or threat to prosecute Plaintiffs for violating the Ordinance.  For example, on

March 23, 2014, Mr. Gridley said in a perfectly clear fashion, that:

> Based on the facts presented to the city by your clients' pleadings in the above
> referenced lawsuit and further review and analysis of the city's anti-discrimination
> ordinance (MC 9.56.010, et seq.) *It is my opinion and the city's position that as
> currently represented, the conduct by the Hitching Post Weddings L.L.C. is exempt
> from the requirements of the ordinance and would not be subject to prosecution
> under the ordinance if a complaint was received by the city.*

10/23/14 Ltr. from Gridley to Cortman, attached as Ex. 9 to Pls.' First Am. Compl. (Docket No.

29, Att. 9) (emphasis added); *see also* Gridley Decl., ¶ 11 (Docket Nos. 24, Att. 2 & 31, Att. 2)

(after being notified that Plaintiffs would not perform same-sex wedding ceremony, "I informed

the Police Department that Plaintiffs had committed no legal wrong and would not be prosecuted

for any violation").  Moreover, Mr. Gridley on behalf of the City has said to the Plaintiffs that

"they will not be prosecuted for refusing to perform same-sex marriages" and that "[s]o long as

Plaintiffs remain a religious corporation, [they] will not be prosecuted pursuant to [the

Ordinance]."  Gridley Decl., ¶ 11 (Docket Nos. 24, Att. 2 & 31, Att. 2).  *See, e.g., Sacks v. Office*

---

[13]  Because the Hitching Post is understood to be a religious corporation and therefore
excepted from the Ordinance, the Court declines Plaintiffs' invitation to weigh in on the contours
of any definition of "religious corporation."  *See* Opp. to MTD, pp. 6, 12, 15 (Docket No. 33).
Perhaps, if the opposite was true and the Hitching Post was *not* considered to be religious
corporation and thus was subject to the Ordinance, such an exercise would be proper and
Plaintiffs would have standing to raise the argument.  Until then, however, it is patently obvious
that the issue is just not ripe for this Court's consideration.  *See, e.g., Thomas*, 220 F.3d at 1141
(on "prudential component of the ripeness doctrine," concluding that "[a] concrete factual
situation is necessary to delineate the boundaries of what conduct the government may or may
not regulate. . . . .  This case is a classic one for invoking the maxim that we do not decide
constitutional questions in a vacuum.") (internal quotation marks and citations omitted).

**MEMORANDUM DECISION AND ORDER - 28**

*of Foreign Assets Control*, 466 F.3d 764, 773-74 (9th Cir. 2006) (finding that, although plaintiff had more than "concrete plan" to violate at-issue restriction, and that defendant had historically targeted other alleged violators of restriction, he failed to demonstrate requisite "specific warning or threat to initiate proceedings" given defendant's decision not to penalize him for numerous known violations of restriction); *but cf. Taylor v. Brasuell*, 2015 WL 413940, *6-7 (D. Idaho 2015) (finding plaintiff's concerns about possible future harms appropriate, despite defendant's cessation of complained-of conduct).[14]  Ultimately, Plaintiffs have failed to demonstrate any specific threat of prosecution for future violations of the Ordinance.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000) (noting that Article III requires plaintiff's injury to be "actual or imminent, not conjectural or hypothetical").[15]

---

[14]  In *Taylor*, this Court denied the defendant's motion to dismiss on mootness grounds, concluding that the defendant's post-litigation conduct (allowing the plaintiff to be interred with her same-sex spouse at the Idaho State Veterans Cemetery), while consistent with the relief originally sought, did not insulate the plaintiff from potential future harm.  *See Taylor*, 2015 WL 413940 at *6-7.  However, after noting the differences between mootness and standing inquiries in the first instance, the undersigned pointed out that, at nearly every turn in the history leading up to (and even subsuming) the case itself, the defendant had vigorously sought to uphold Idaho's same-sex marriage ban which, if eventually successful, would have necessarily harmed plaintiff on the unusual facts of that case.  *See id.* at *7.  Here, the City's quantum of conduct is not on the same order as the defendant's conduct in *Taylor* – the record now before the Court offers no indication that the City would prosecute Plaintiffs for violating the Ordinance if simply given the chance; indeed, had the City wanted to so prosecute Plaintiffs, they would have done so already.

[15]  To the extent Plaintiffs argue that the City's conduct in Spring/Fall 2014 represents a sufficient threat of prosecution, it is misplaced for the purposes of any prospective pre-enforcement challenge.  *See* Opp. to MTD, pp. 13-15 (Docket No. 33).  Such arguments speak to the Knapps' decision to close the Hitching Post for seven days in September 2014 and their corresponding claim for economic damages during that time.  *See supra*; *see also* Opp. to MTD,

**MEMORANDUM DECISION AND ORDER - 29**

Third, Plaintiffs have not identified any instance in which the City has initiated proceedings against an individual or business for violating the Ordinance, or prosecuted anyone for the violating any provision of the entire ordinance.  *See* Gridley Decl., ¶ 5 (Docket Nos. 24, Att. 2 & 31, Att. 2) ("The anti-discrimination ordinance has been in force for approximately one and one-half years, and the City has pursued no prosecution pursuant to the ordinance.").  The lack of any such enforcement history does not support a finding that Plaintiffs have standing to bring a pre-enforcement challenge to the Ordinance.[16]

Without the presence of any of the factors necessary to establish standing for a pre-enforcement challenge, Plaintiffs cannot bring a pre-enforcement challenge to the Ordinance. Defendant's Motion to Dismiss is therefore granted in this respect.

///

///

///

---

p. 14 (Docket No. 33) ("The City cannot retroactively undo the actual and real harm its repeated threats caused the Knapps (namely, loss of clients and income due to business closure) by claiming after suit is filed that it no longer intends to enforce the ordinance against them."). However, they no longer represent any threat of prosecution in the future, given the City's clear position that Plaintiffs qualify for the protections afforded a religious corporation and will not be prosecuted for refusing to officiate same-sex weddings.  *See supra.*

[16]  Plaintiffs assert that, at the very least, the lack of historical enforcement is a neutral factor given that it has only "been on the books for a little over a year."  Opp. to MTD, p. 15 (Docket No. 33) (citing *Thomas*, 220 F.3d at 1140-41 (9th Cir. 1999)).  In *Thomas*, the Ninth Circuit nonetheless concluded that the plaintiffs did not have standing to bring a pre-enforcement challenge.  *See Thomas*, 220 F.3d at 1141 ("Considering the applicable factors, we hold that any threat of enforcement or prosecution against the landlords in this case – though theoretically possible – is not reasonable or imminent.  The asserted threat is contingent upon the occurrence of unforeseeable events . . . .  The landlords at this time do not confront a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement, and thus this dispute is not justiciable, because it is not ripe for court review.") (internal quotation marks and citations omitted).

**MEMORANDUM DECISION AND ORDER - 30**

## V.  <u>ORDER</u>

Based on the foregoing, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss First Amended Complaint (Docket No. 31) is GRANTED, in part, and DENIED, in part, as follows:

1.      Plaintiffs have standing to bring a claim for economic injuries for the single day of October 15, 2014; in this respect, Defendant's Motion to Dismiss is DENIED;

2.      Plaintiffs do not have standing to bring a claim for economic injuries for other periods, to include October 7, 8, 9, 10, 11, and 14, 2014; in this respect, Defendant's Motion to Dismiss is GRANTED; and

3.      Plaintiffs do not have standing to bring a pre-enforcement challenge to Ordinance § 9.56; in this respect, Defendant's Motion to Dismiss is GRANTED.

DATED:  **March 25, 2016**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 31**